SOUTH MACOMB DISPOSAL AUTHORITY v NATIONAL SURETY
CORPORATION
SOUTH MACOMB DISPOSAL AUTHORITY v CITIZENS INSURANCE
COMPANY OF AMERICA

Docket Nos. 214504, 214825. Submitted May 4, 1999, at Detroit. Decided
January 11, 2000, at 9:10 A.M. Leave to appeal denied, 462 Mich ___.

South Macomb Disposal Authority brought an action in the Macomb
Circuit Court against National Surety Corporation, Citizens Insur-
ance Company of America, and other insurers, seeking a declara-
tion compelling the defendants to defend the plaintiff in an action
brought by owners of property adjoining four landfills operated by
the plaintiff. The property owners claimed groundwater contamina-
tion caused by leachate from the landfills. With respect to a 1971
leachate outbreak from landfill site 9A, the court, Michael D.
Schwartz, J., denied summary disposition for defendants National
Surety Corporation, Westchester Fire Insurance Company, and Citi-
zens Insurance Company of America, rejecting their argument that
the outbreak was not sudden and accidental and that insurance
coverage therefore was excluded by the pollution exclusion clauses
of their policies. The court granted summary disposition for the
plaintiff with respect to its claim that insurance policies issued by
Citizens from April 1968 to April 1971, which neither party was able
to present to the court, did not include pollution exclusion clauses.
The court ruled that Citizens failed to establish a genuine issue of
material fact concerning the existence and terms of those policies.
Finally, the court, in several orders, directed Citizens to pay costs
incurred by the plaintiff in defending against the property owners'
action. National Surety Corporation appealed by leave granted. Citi-
zens was denied leave to appeal in the Court of Appeals. However,
the Supreme Court, in lieu of granting leave to appeal, remanded
the matter to the Court of Appeals for consideration as on leave
granted. 459 Mich 874 (1998). The appeals were consolidated.

The Court of Appeals held:

1. The trial court, in denying summary disposition for the defend-
ant insurers with respect to the 1971 leachate outbreak from site
9A, erred in concluding that the pollution exclusion clauses of the
insurance policies did not apply to exclude coverage. The applica-

tion of a pollution exclusion depends on the discharge, dispersal, release, or escape of the contaminant into the environment. The behavior or migration of the contaminant in the environment after the initial release is irrelevant. In this case, the underdrain of site 9A, which was designed to intercept and redirect groundwater flowing toward site 9A, began discharging leachate-contaminated groundwater. The source of that leachate, however, was not site 9A, but was site 9. Thus, the pollution exclusion clauses of the defendants' policies apply to exclude coverage for the claimed 1971 leachate outbreak from site 9A because site 9A was not the source of the leachate.

2. The trial court erred in granting summary disposition for the plaintiff with respect to its claim that it had held Citizens policies with no pollution exclusion clauses from April 1968 to April 1971. Citizens presented evidence establishing that there is a genuine issue of material fact regarding the existence and terms of those policies.

3. The trial court did not err in ordering Citizens to pay costs incurred by the plaintiff in defending against the property owners' action. Those costs were related, at least in part, to the 1971 leachate discharge or the continuous leakage that occurred from 1968 to 1971. In either case, Citizens would have a duty to defend, and would thus be responsible for defense costs, if the plaintiff can establish the existence of the Citizens policies with no pollution exclusion clauses. The trial court did not err in ordering Citizens to reimburse one-third of the plaintiffs' defense costs previously paid by Evanston Insurance Company. Citizens is responsible as primary insurer, given that Evanston's policies had "other insurance" clauses while Citizens' policies did not. The matter must be remanded for specific findings in support of the trial court's decision to order Citizens to pay those of the plaintiff's defense costs not covered by the trial court's July 24, 1995, order.

Affirmed in part, reversed in part, and remanded.

INSURANCE — LIABILITY — POLLUTION EXCLUSION.

Application of a pollution exclusion in a liability insurance policy depends on the discharge, dispersal, release, or escape of the contaminant into the environment; the behavior or migration of the contaminant in the environment after the initial release is irrelevant.

*Dykema Gossett PLLC* (by *Roger K. Timm* and *John A. Ferroli*), for South Macomb Disposal Authority.

*Rivkin, Radler & Kremer* (by *Daniel A. Bartoldus* and *Joshua N. Krellen*) and *Nemier, Tolari, Landry, Mazzeo & Johnson, P.C.* (by *Michelle E. Mathieu*), for National Surety Corporation and American Insurance Company.

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *Leonard B. Schwartz* and *Patrick Burkett*), for Westchester Fire Insurance Company.

*Crozier & Blais* (by *Linda L. Blais*), for Citizens Insurance Company of America.

*Plunkett & Cooney, P.C.* (by *James D. Wilson*), for Cranford Insurance Company and International Insurance Company.

*O'Leary, O'Leary, Jacobs, Mattson, Perry & Mason, P.C.* (by *John P. Jacobs*) and *Seyburn, Kahn, Ginn, Bess, Deitch & Serlin, P.C.* (by *Barry M. Rosenbaum*), for Evanston Insurance Company.

Before: MARKEY, P.J., and HOLBROOK, JR., and NEFF, JJ.

PER CURIAM. The cases that make up this consolidated appeal come to us through different procedural routes. In Docket No. 214504, this Court granted defendant National Surety Corporation's (hereinafter FFIC) application for leave to appeal the trial court's September 1, 1998, opinion and order granting partial summary disposition to plaintiff and denying FFIC's motion for summary disposition. In Docket No. 214825, the Michigan Supreme Court, in lieu of granting leave, remanded the case to our Court for consideration as on leave granted. *South Macomb Disposal Authority v Westchester Fire Ins Co*, 459 Mich 874

(1998). The appeal in Docket No. 214825 also centers on the trial court's September 1, 1998, opinion and order. We affirm in part, reverse in part, and remand.

## I. BACKGROUND FACTS

The complicated and protracted history of these cases was set forth in *South Macomb Disposal Authority v American Ins Co (On Remand)*, 225 Mich App 635; 572 NW2d 686 (1997) (hereinafter *SMDA I*). In a nutshell, these cases stem from environmental contamination caused by the leakage of leachate[1] from four landfill sites operated by plaintiff "at various times from the late 1960s to the mid-1980s." *Id.* at 643. This appeal only concerns issues related to the operation of the two sites designated 9 and 9A.

> In April 1968, the [Michigan Department of Public Health (DPH)] issued a license to plaintiff to operate . . . site [9] as a landfill. . . . Within six months, plaintiff received unsatisfactory comments about its operation of the site. . . . Groundwater problems occurred at site 9, which plaintiff worked to overcome. The site was licensed until it was closed in 1975.
>
> Plaintiff sought to expand its landfill operations by including site 9A in 1971. Again, the [Michigan Department of Natural Resources (DNR)] and the DPH specifically informed plaintiff about the foreseeable watertable problems at the site. Although the DPH licensed site 9A in February 1971, the license included stipulations regarding the replacement of sand, underdrain modifications, the con-

---

[1] Leachate is a hazardous fluid formed when water infiltrates and percolates down through compacted refuse, like that found in plaintiff's landfills. As the water passes through the waste material, components of the waste either become dissolved or suspended in the liquid. Leachate is not defined by any particular set of pollutants. Rather, leachate may contain various pollutants depending on the material found in a given refuse site.

struction of a perimeter clay dike and the placement of fill material not less than four feet above the subsurface drain. Site 9A was closed in 1979.

While site 9A was operating, specific complaints regarding leachate outbreaks arose. The first occurred in 1971, shortly after the site opened, and the second in June 1976. A third outbreak occurred in 1980. . . . Throughout the time when site 9A was operating, numerous problems occurred, including . . . severe leaching of leachate. The underdrain system at the site also had problems. . . . The McBride Drain, which ran near the site, had shown evidence of degradation. On several occasions, leachate from site 9A discharged into the McBride Drain. [*Id.* at 645-646.]

After determining that the three alleged leachate outbreaks from site 9A could be considered separately from the overall leaching problem "for purposes of the 'sudden and accidental' exception to the pollution exclusion in the [insurance] policies," *id.* at 684, the Court in *SMDA I* concluded that, as a matter of law, both the 1976 and 1981 outbreaks could not be considered to have been sudden and accidental. *Id.* at 685-687. However, the *SMDA I* Court concluded that a genuine issue of material fact did exist regarding whether the 1971 outbreak was sudden and accidental. *Id.* at 685. The Court instructed that on remand "the circumstances of this outbreak must be further developed so that the court may determine whether it was expected or sudden and accidental." *Id.*

### II. THE 1971 OUTBREAK AND THE APPLICABILITY OF THE POLLUTION EXCLUSIONS

Defendants FFIC, Westchester Fire Insurance Company, and Citizens Insurance Company of America contend that the trial court erred in denying them summary disposition. Specifically, defendants argue

that the 1971 outbreak was excluded from coverage by the insurance policies' pollution exclusion clauses. We agree.[2] "This Court reviews decisions on motions for summary disposition de novo." *Auto Club Ins Ass'n v Sarate*, 236 Mich App 432, 434; 600 NW2d 695 (1999).

> A motion pursuant to MCR 2.116(C)(10) tests the factual basis underlying a plaintiff's claim. MCR 2.116(C)(10) permits summary disposition when, except for the amount of damages, there is no genuine issue concerning any material fact and the moving party is entitled to damages as a matter of law. A court reviewing such a motion must consider the pleadings, affidavits, depositions, admissions, and any other evidence in favor of the opposing party and grant the benefit of any reasonable doubt to the opposing party. [*Stehlik v Johnson (On Rehearing)*, 206 Mich App 83, 85; 520 NW2d 633 (1994).]

The trial court's decision was based on its conclusion that the 1971 outbreak was sudden and accidental, which in turn was predicated on its conclusion that the discharge of leachate from the underdrain was the initial discharge into the environment. We believe that both of these findings are erroneous.

In *Protective Nat'l Ins Co of Omaha v Woodhaven*, 438 Mich 154, 162; 476 NW2d 374 (1991), our Supreme Court concluded that application of a pollution exclusion such as is found in this case depends "on the discharge, dispersal, release, or escape" of the contaminant into the environment. The behavior or migration of the contaminant in the environment after the initial release is irrelevant. *Id.* In *Kent Co v Home*

---

[2] Given this conclusion, we need not address defendants' other arguments concerning the propriety of the trial court's handling of the motions for summary disposition.

*Ins Co*, 217 Mich App 250, 288; 551 NW2d 424 (1996), this Court further explained that "[i]f waste materials are placed in a contained area or structure and later escape into the environment, the later discharge is the relevant discharge." See also *Traverse City Light & Power Bd v Home Ins Co*, 209 Mich App 112; 530 NW2d 150 (1995).[3]

The underdrain was installed along the northern boundary of site 9A. The record establishes that the underdrain was built to intercept and redirect groundwater flowing toward site 9A.[4] Two perforated pipelines, six inches in diameter, were placed in the water table[5] along the boundary. One pipe directed groundwater flow from west to east, and the other directed the flow from east to west. Where the two lines met, a separate line directed the combined flow to the south toward a drainage ditch that ran along the western perimeter of site 9.[6] From there, the contaminated water flowed into the McBride Drain.

Plaintiff's expert, Dr. Michael Sklash,[7] averred that the "Site 9A underdrain first discharged clean groundwater but sometime after the underdrain first went into operation, it abruptly began to discharge contam-

---

[3] In *Traverse City Light & Power*, *supra* at 117, the Court concluded that the initial discharge occurred when fly ash was placed into a gravel pit not licensed as a landfill, not when leachate subsequently migrated into an underground aquifer.

[4] According to an unchallenged report in the record, sites 9 and 9A are located on the southwest side of a groundwater mound. The report indicates that the groundwater in the immediate area flows southwest toward the McBride Drain.

[5] The water table is the "surface below which rocks are saturated with water." Foster, Geology (4th ed), p 94.

[6] A similar drainage ditch also ran along the southern boundary of site 9. These ditches were constructed to intercept groundwater and rainwater runoff.

[7] Dr. Sklash has a Ph.D. in Earth Sciences.

inated groundwater." Sklash further concluded that the contaminated groundwater was drawn from underneath the site 9 perimeter ditch. Roy Schrameck, who in 1971 was an Assistant District Supervisor for the DNR in the Bureau of Water Management, averred that on or about July 26, 1971, the DNR received a complaint that the water in the McBride Drain was degraded. On the basis of his subsequent investigation, Schrameck opined "that groundwater contaminated with leachate was migrating from site 9 and was entering the underdrain under the north side of site 9A, . . . and discharged . . . to the perimeter ditch and then into the McBride Drain." The conclusion that site 9 was the source of the contaminated groundwater is not contested by plaintiff on appeal.

On the basis of this record, we conclude that the discharge of leachate-contaminated groundwater from the underdrain cannot be considered the initial discharge of pollution into the environment. The underdrain was constructed not as a leachate collection and treatment system,[8] but as a conduit through which groundwater could be diverted from around site 9A.[9] Regardless of the fact that the licensing of site 9A was in part premised on the construction of the underdrain, this secondary migration of the contaminated groundwater is irrelevant to the question whether the pollution exclusion applies. Rather, as defendants correctly assert, the initial discharge of

---

[8] A leachate collection system "gathers leachate and pumps it to the surface for treatment." Environmental Law Dictionary (1993), p 85.

[9] There is nothing in the record to suggest that the perimeter ditch was designed to retain contaminated wastewater for treatment.

contamination was the outbreak of leachate into the groundwater from the bottom of site 9.

Contrary to plaintiff's assertion, the conclusion that the site 9 leaching is the relevant initial discharge does not contradict the holding of *SMDA I*. In that earlier case, defendants argued that the dumping of the waste material into the landfill was the initial discharge. Plaintiff countered that it was the discharge of the leachate from the landfill into the soil that was the relevant discharge. This Court agreed with plaintiff. "[W]e agree," the Court stated, "that the proper focus is the leaking of leachate and contaminants from the landfill into the surrounding soil and groundwater because the refuse had been placed into a landfill designed and licensed *to contain waste*." *SMDA I, supra* at 672 (emphasis added). However, as we have already concluded, the underdrain was not designed as a containment system.

Plaintiff's reliance on *Gridley Associates Ltd v Transamerica Ins Co*, 828 P2d 524 (Utah App, 1992), is also misguided. The plaintiff in *Gridley* owned a self-service gasoline station. At some point, gasoline leaked from a pipe connecting the underground storage tank to the station's gasoline pumps. *Id.* at 524-525. The pipes that make up the underdrain in the case at hand are conceptually and functionally dissimilar to the gasoline line in *Gridley*. Unlike the underdrain, the *Gridley* pipe was an integral part of the gasoline containment system. Attached to the underground storage tank, the pipe was intended to transfer gasoline from that tank to the pumps for dispersal into other gasoline containers. Conversely, the site 9A underdrain, which was separate from the landfill con-

tainers, was not designed to either hold contaminants or safely transfer them to another waste container.

Finally, we conclude that plaintiff failed to present any evidence to establish a genuine issue of material fact regarding whether the discharge of leachate from site 9 was sudden. Indeed, plaintiff's argument both below and on appeal focuses on whether the discharge from the underdrain was sudden. In support of its contention that this discharge was sudden, plaintiff relies on Dr. Sklash's second affidavit. In that document, Sklash averred that the change in discharge from the underdrain of clean to contaminated groundwater "would have been abrupt." However, the speed of the change in quality of the discharge from the underdrain does not tell us anything about either the suddenness of the discharge from site 9 or the rate of the movement of the contaminated groundwater from site 9 to the underdrain.[10]

### III. LOST INSURANCE POLICIES

Citizens also contends that the trial court erred in concluding that Citizens had failed to establish a genuine issue of material fact with regard to the existence and terms of insurance policies alleged to have been issued to plaintiff by Citizens during the period from April 1968 through April 1971. Plaintiff contends that these alleged policies did not contain a pollution exclusion clause. Copies of the policies have never been located.

MCR 2.112(D) provides in pertinent part:

---

[10] We note that at least one text indicates that the "average rate of movement of ground water through rocks is about 50 feet (15 m) per year." Foster, *supra* at 95.

(1) In an action on a policy of insurance, it is sufficient to allege
    (a) the execution, date, and amount of the policy,
    (b) the premium paid or to be paid,
    (c) the property or risk insured,
    (d) the interest of the insured, and
    (e) the loss.

After reviewing the record, we believe that there is a genuine issue of material fact regarding both the existence and the terms of the alleged lost policies.

Plaintiff submitted as evidence of the existence of the policies minutes of its board meetings, during which payments for insurance premiums were discussed. These minutes refer to premiums paid for several insurance policies issued during the relevant period by the Eisele-Martin Agency, Inc., and Beaver Underwriters.[11] Victor Martin, owner of the Eisele-Martin Agency from January 1966 through June 1969, averred that although he had no specific recollection, he had a "general feeling" that Citizens was plaintiff's general liability carrier during those years. Martin stated that when he bought the J.L. Eisele Agency in 1966, all commercial liability business was through Citizens. If the J.L. Eisele Agency had insured plaintiff with Citizens, which Martin could not specifically recollect, he did not believe he would have altered that relationship.

---

[11] The SMDA minutes contain the following notations:

| DATE | PAYEE | REFERENCE | AMOUNT |
|---|---|---|---|
| 4/23/65 | J.L. EISELE AGENCY, INC. | Renew pol. #MCL 17124 | $54.00 |
| 4/29/66 | J.L. EISELE AGENCY, INC. | Renew pol. #MCL 18723 (liability) | $54.00 |
| 5/8/67 | J.L. EISELE AGENCY, INC. | Renewal on pol. #B002203 | $67.00 |
| 4/30/68 | EISELE-MARTIN AGENCY | Renew pol. #3002-203R | $67.00 |
| 3/21/69 | EISELE-MARTIN AGENCY | Bond, premises liability | $167.00 |
| 12/10/70 | BEAVER UNDERWRITERS | Liability audit B 006 828 | $36.00 |
| 2/11/71 | BEAVER UNDERWRITERS | Liability policy | $71.00 |

Louis H. Thurau purchased the Eisele-Martin Agency in 1969. He believed that Citizens was plaintiff's liability carrier in June 1969. According to Thurau, the policy designated "B 006 828" in the minutes, was a Citizens policy. Frederick Richter, a Citizens employee since 1961, stated that Citizens used the letter prefix "B" on its general liability policies issued from 1968 through 1971. Mac Thomas, another Citizens employee, stated that he believed he had seen Citizens' policies with the "MCL" prefix, although he could not say that such policies would necessarily have a general liability component.

Citizens countered this evidence in several ways. First, Citizens pointed to the fact that neither Martin nor Thurau could specifically and unequivocally state that plaintiff had a general liability policy with Citizens during the relevant period. Citizens also offered the deposition of Bette Van Blaricum, a long-time Citizens employee. Van Blaricum averred that the numbering sequences and policy designations referenced in plaintiff's board minutes could not have referred to Citizens' policies issued during the years 1968 through 1971. After examining policy numbers from existing reinsurance billings issued during those years, Van Blaricum opined that the 1965 and 1966 policies were not Citizens policies. Regarding the "B002203" designation, she concluded that this "numbering sequence on a 'B' policy would have been several years before the time period we are speaking of." She also was sure that the "3002203R" designation was "definitely . . . not a Citizens policy number." Finally, Citizens noted that the upper left-hand corner on each policy following the 1971/1972 policy contained a number that corresponds to the policy number for the previ-

ous year. The 1971/1972 policy, which is still in existence, does not contain a number in this corner of the document.

Reviewing this evidence in a light most favorable to Citizens as the nonmoving party, *Stehlik, supra* at 83, we conclude that Citizens has established that there is a genuine issue of material fact regarding the existence of the alleged policies. Accordingly, we conclude that the trial court erred in granting summary disposition to plaintiff with regard to the existence and terms of the alleged policies.

### IV. DEFENSE COSTS

Finally, Citizens raises three challenges to decisions of the trial court addressing the issue of defense costs. We examine each separately.

First, Citizens argues that the trial court erred in granting in its September 1, 1998, opinion and order plaintiff's motion to compel Citizens to pay defense costs. We disagree. In granting plaintiff's motion, the trial court stated:

> Having carefully reviewed the issues presented in SMDA's motion to compel payment of defense costs, the Court is persuaded all of such costs were incurred by SMDA to defend against claims that are based, at least in part, on the 1971 discharge of leachate from the underdrain of Site 9A. The Court is further persuaded all of the costs incurred were reasonable under the circumstances that existed at the time such costs were incurred.

The trial court's analysis of the defense costs issue was predicated on its previous conclusions regarding the relevant discharge and the existence and terms of the alleged lost insurance policies. We have rejected as erroneous the trial court's conclusion regarding

both of these issues. However, if plaintiff can establish that the policies did exist and that they did not contain the relevant pollution exclusion clause, then Citizens arguably would have a duty to defend and would thus be responsible for defense costs. See *Auto-Owners Ins Co v City of Clare*, 446 Mich 1, 15; 521 NW2d 480 (1994); *Woodhaven, supra* at 159-160. Further, after reviewing the record, we believe that the defense costs sought were related, at least in part, to either the 1971 leachate discharge or the continuous leakage that occurred from 1968 through 1971. Accordingly, we see no error requiring reversal.

We also disagree with Citizens' contention that the trial court erred in holding in its July 24, 1995, opinion and order that Citizens must reimburse one-third of the defense costs previously paid by Evanston Insurance Company. Evanston provided concurrent coverage for the period at issue. Contrary to Citizens' assertion, plaintiff does have standing to raise the matter of reimbursement given its substantial personal stake in the outcome of the issue. See *Taylor v Blue Cross & Blue Shield of Michigan*, 205 Mich App 644, 655-656; 517 NW2d 864 (1994).

Additionally, after reviewing the relevant provisions in Citizens' "occurrence-based" policies and the Evanston "claims made" policy, *Frankenmuth Mut Ins Co v Continental Ins Co*, 450 Mich 429, 438; 537 NW2d 879 (1995), we conclude that the trial court did not err in holding Citizens responsible as a primary insurer and Evanston as an excess insurer. The Evanston policy contains the following "other insurance" clause:

> This insurance shall be in excess of the amount of the applicable deductible of this policy and any other valid and

collectable Insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other Insurance is written only as specific excess Insurance over the limits of liability provided in this policy.

Citizens' policies do not have "other insurance" clauses. Therefore, to the extent that Citizens is responsible for defense costs under its policies, the Evanston policy provides only excess secondary coverage. *St Paul Fire & Marine Ins Co v American Home Assurance Co*, 444 Mich 560, 568; 514 NW2d. 113 (1994). Thus, given that Citizens arguably has a duty to defend, we conclude that the trial court did not err in finding Citizens is responsible, in part, for defense costs already expended by Evanston.

Citizens also argues that the trial court erred in ordering it to pay defense costs not covered in the court's July 24, 1995, order. Given the lack of specifics in the record regarding the nature of the claimed expenses and the trial court's reasoning in support of its decision, we remand this issue to the trial court for specific findings regarding the claimed costs.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.